# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Darin Mathew Schake,

                Plaintiff,

v.

Nancy A. Berryhill, Acting
Commissioner of Social Security,

                Defendant.

Case No. 0:17-cv-01831-KMM

**ORDER**

    Darin Mathew Schake applied for disability benefits from the Social Security Administration. Following a hearing, an Administrative Law Judge ("ALJ") denied his application and that became the final decision of the Commissioner of Social Security. Mr. Schake filed this case seeking judicial review of the Commissioner's decision. It is now before the Court on the parties' cross motions for summary judgment. [Pl.'s Mot., ECF No. 13; Def.'s Mot., ECF No. 15.] For the reasons that follow, the Mr. Schake's motion is denied and the Commissioner's motion is granted.

## I.    Background

    Mr. Schake, who is now 45 years old, had a motorcycle accident on May 18, 2012, from which he suffered a significant head injury, multiple fractures, and a ruptured spleen. He also began experiencing seizures. (Admin. Record ("AR") 247–48 (indicating emergency room visit for motorcycle accident), ECF No. 8; AR 322–24 (representative brief summarizing aftermath of motorcycle accident).) After a brief return to employment following the accident, he stopped working on February 22, 2013. (AR 206–07; AR 238 (alleged onset date).) Before his accident Mr. Schake had held several different jobs, working at various times as a painter, a supervisor of the paint department at a machine shop, and a driver. (AR 243, 265–71, 284–91, 318.)

## Disability Application and Procedural History

In September of 2013, Mr. Schake applied for Social Security disability income benefits. (AR 206–07.) Mr. Schake explained that his ability to work was limited by the following issues:

1. Seizures, 5 plates in right side of skull
2. 2 plates in back
3. 2 plates in the shoulder blade
4. 1 plate in collar bone
5. sever[e] pain
6. depression

(AR 242.) These conditions prevent Mr. Schake from driving, affect his balance, give him migraine headaches, and limit his yard work and engagement in hobbies. He also experiences difficulties lifting objects he previously could, squatting, standing for long periods, and kneeling. Mr. Schake explained that he has a shorter temper, cries easily, has difficulty handling stress, and makes mistakes if there are changes to his routine. (AR 292–99.)

After Mr. Schake's disability application was denied initially and on reconsideration, he requested a hearing before an ALJ. (AR 112–48; AR 161–62 (request for hearing).) ALJ Peter Kimball held a hearing on April 15, 2016. (AR 63–111 (transcript of hearing).) On June 2, 2016, the ALJ issued a written decision, concluding that Mr. Schake was not disabled within the meaning of the Social Security Act. (AR 29–56 (unfavorable decision).) The Social Security Appeals Council denied Mr. Schake's request for review of the ALJ's decision, making ALJ Kimball's opinion the final decision of the Commissioner. (AR 15–24 (request for Appeals Council review and representative brief); AR 4–9 (Appeals Council denial of request for review).)

## The ALJ's Decision

ALJ Kimball's decision followed the five-step sequential evaluation applicable to Social Security disability cases. First, he found that Mr. Schake has not been

engaged in substantial gainful activity. Second, he found that Mr. Schake has several severe impairments, including: traumatic brain injury; mood disorder; posttraumatic stress disorder ("PTSD"); anxiety disorder; memory loss and executive function deficit; seizure disorder; cervical spine degenerative disc disease (C6-7); and left clavicle and scapula fractures post-surgery. Third, ALJ Kimball found that none of Mr. Schake's impairments, either alone or in combination, meet or medically equal any of the listed impairments in the governing regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").[1] At the fourth step, ALJ Kimball first determined Mr. Schake's residual functional capacity ("RFC"), ultimately finding that he still has the ability to do "light" work with additional restrictions. The ALJ also determined that Mr. Schake, given his RFC, was not able to perform any of his past relevant work. But at the fifth step, ALJ Kimball concluded that there are jobs in significant numbers in the national economy that Mr. Schake could perform with his RFC, and therefore he is not disabled. (AR 29–56.) In this case, Mr. Schake challenges ALJ

---

[1]     The Supreme Court explains the Listings as follows:

> The listings . . . are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . .

> For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment. . . . A claimant cannot qualify for benefits under the "equivalence" step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment.

*Sullivan v. Zebley*, 493 U.S. 521, 529–32 (1990) (citations and footnotes omitted).

Kimball's conclusions regarding the Listings and his formulation of Mr. Schake's RFC.

### The ALJ's Listings-Related Determinations

With respect to the Listings, ALJ Kimball found that Mr. Schake "does not have an impairment or combination of impairments that meets or medically equals the severity of any of the [Listings]." (AR 31.) The ALJ noted that no "'medical source' . . . has offered either an express opinion or other evidence that would serve to establish that, since the alleged onset date," Mr. Schake meets or medically equals any of the Listings.[2] (AR 32.)

ALJ Kimball considered the Listing for convulsive epilepsy (Listing 11.02). (AR 32–33.) The ALJ made the following findings:

> With respect to 11.02, the administrative record overall is not significant for convulsive epilepsy (grand mal or psychomotor) documented by detailed description of a typical seizure pattern including all associated phenomenon, occurring more frequently than once a month, in spite of at least three months of prescribed treatment with either daytime episodes (loss of consciousness and convulsive seizures) or nocturnal episodes manifesting residuals that interfere significantly with activity during the day. Instead, the evidence shows that when the claimant is compliant with prescribed treatment, he does not experience seizures at this listings level of severity.

(AR 32.)

---

[2]     ALJ Kimball noted that there was no opinion evidence in the record, including from state agency medical consultants retained by the Commissioner to provide expert evidence, that Mr. Schake's impairments or combination of impairments meets or medically equals any of the physical impairment Listings. (AR 32.) Specifically, the ALJ considered Listing 1.02 for major dysfunction of a joint. (AR 32.) Mr. Schake does not challenge the ALJ's findings regarding Listing 1.02, nor does he contend that the ALJ erred in finding that no medical source offered an opinion that he meets or medically equals a listing.

The ALJ also found that Mr. Schake's mental impairments, either alone or in combination, do not meet or medically equal the criteria for Listing 12.02 (organic mental disorders), Listing 12.04 (affective disorders), and Listing 12.06 (anxiety-related disorders). (AR 33.) ALJ Kimball considered the "paragraph B" criteria, which are the same across these three listings and address restrictions in: activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.[3] (AR 33.) The ALJ concluded: "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (AR 35.)

In addressing the paragraph B criteria, ALJ Kimball specifically found that Mr. Schake had only mild restrictions in activities of daily living, explaining that Mr. Schake had reported living independently in a private residence, engaging in household chores, needing no special reminders to take care of personal needs, keeping regular hours, and preparing his own meals. (AR 33.) In addition, ALJ Kimball found Mr. Schake exhibited only moderate difficulties in social functioning and maintaining concentration, persistence, and pace. (AR 33–34.) Regarding social functioning, ALJ Kimball explained that Mr. Schake can regularly shop in stores and go outside, be in public, and spend time with others daily. (AR 33.) The ALJ observed that Mr. Schake reported having a shorter temper after his motorcycle accident, but "generally doing well with authority figures." (AR 33–34.) In finding only moderate restrictions in maintaining concentration, persistence, and pace, ALJ Kimball reasoned that although Mr. Schake reported issues with his memory, concentrating, completing tasks, understanding and following instructions, handling

---

[3]     ALJ Kimball found no episodes of decompensation in the record. (AR 34.) Mr. Schake does not challenge this finding. The ALJ also found that the so-called "paragraph C" criteria were not satisfied. (AR 34.) Mr. Schake does not raise any issue with the paragraph C criteria.

stress, and handling changes in routine, he indicated that he was able to count change, pay bills, and handle household and banking accounts. (AR 34.) Mr. Schake was able to remember to take his medication when he started using a seven-day pillbox, could follow television programming, and could play guitar, "albeit with some left-hand weakness." (AR 34.) ALJ Kimball also noted that neuropsychological evaluations showed Mr. Schake's cognitive performance is "in the low-average range, with a full-scale IQ score of 87; his verbal skills were noted to be significantly weaker than his visuospatial skills." (AR 34.)

ALJ Kimball concluded that the paragraph B criteria were not satisfied in part based on the opinions of non-examining state agency psychological consultants who reviewed Mr. Schake's records. (AR 34.) The ALJ gave these opinions "significant evidentiary weight" because they were generally consistent with the evidence overall, including Mr. Schake's own function report forms. (AR 34.) ALJ Kimball also assigned these opinions "great weight" in concluding that "no physical or mental impairment individually or in combination medically equals" any of the Listings. (AR 35.) He further found that a neuropsychological evaluation performed by Dr. Robert Doss at the Minnesota Epilepsy Group on March 25, 2014 was consistent with the conclusion that Mr. Schake "could return to some work activity in spite of his mental impairments." (AR 34–35.)

### The ALJ's RFC Analysis

As noted above, ALJ Kimball determined that Mr. Schake retained the ability to perform "light" work, as that term is defined in 20 C.F.R. § 404.1567(b), with some additional limitations. (AR 35–36.) The additional limitations found by ALJ Kimball that are specifically at issue in this proceeding include the following:

> [Mr. Schake is] limited to performing simple, routine and repetitive tasks, but not at a production rate pace (for example, assembly line work); [he is] able to respond appropriately to supervisors on an occasional basis; [he is] able to respond appropriately to coworkers on an occasional basis; and [he is] able to respond appropriately to the public on an occasional basis.

(AR 35–36.)

In formulating these limitations, ALJ Kimball discussed evidence in the record concerning both Mr. Schake's seizure disorder and his mental impairments. Regarding the seizure disorder, the ALJ noted that in February of 2016, Mr. Schake reported having four seizures during the previous year though "*he had stopped taking all anti-epilepsy drugs one year earlier . . . due to insurance issues.*" (AR 47 (emphasis in original).) ALJ Kimball also stated that Mr. Schake "had seizures on occasion," but found that they "most typically" occurred "in a setting of frank medication noncompliance." (AR 48.) The ALJ concluded that "[t]he record as a whole shows that with medication compliance, the claimant's seizure disorder is largely well-controlled." (AR 48.)

Concerning Mr. Schake's mental impairments, ALJ Kimball found that "the intensity, persistence and functionally limiting effects of the symptoms alleged . . . are not supported by a preponderance of the evidence." (AR 48.) The ALJ gave significant evidentiary weight to the opinions of non-examining state agency psychological consultant opinions provided at the initial and reconsideration levels. (AR 48–49.) He found that their opinions were overall consistent with the objective medical evidence concerning the course of treatment for Mr. Schake's mental health issues, but he noted differences in the terminology used in the mental RFC articulation and that used by the consultants. (AR 48–49; *see also* AR 52–53.)

In assessing Mr. Schake's abilities, ALJ Kimball gave little evidentiary weight to Dr. Dorothy Edelson's April 2014 opinion, which suggested that greater restrictions may be needed to address Mr. Schake's mental limitations. (AR 53.) Similarly, the ALJ gave little weight to an opinion offered by a treating neurologist, Dr. Peter Boardman, on November 7, 2013, indicating that Mr. Schake temporarily could not work due to his seizure disorder because the opinion was "not generally consistent with the evidence overall which show[s] that with medication compliance the claimant's seizure disorder is generally effectively controlled." (AR 53–54.) In contrast, ALJ Kimball gave significant evidentiary weight to the July 9, 2014 opinion of Dr. Paul Atkinson, a treating medical source, who pronounced that Mr. Schake should not drive, work at

heights, work with hazards, or work a job that required substantial new learning of tasks and procedures, but did not conclude that work was impossible. The ALJ noted that his RFC finding was somewhat more restrictive than Dr. Atkinson's opinion, imposing "additional limitations pertaining to the claimant's subsequent left shoulder reinjury, as well as limitations in social functioning." (AR 54.) He also accorded little weight to several opinions that suggested Mr. Schake's mental impairments posed no limitations on his ability to work. (AR 53 (discussing opinions of June 23, 2012, January 15, 2013, and March 21, 2013).)

## II.    Legal Standard

In reviewing the Commissioner's denial of Mr. Schake's application for benefits the Court determines whether the decision is supported by "substantial evidence on the record as a whole" or results from an error of law. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017); *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance of the evidence, but is such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citations and quotation marks omitted).

In considering whether the Commissioner's decision is adequately supported, the Court considers not only the evidence supporting the Commissioner's decision, but also the evidence in the record that "fairly detracts from that decision." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). However, the Court does not reverse the Commissioner's decision merely because substantial evidence also supports a contrary outcome or the record might support a different conclusion. *Gann*, 864 F.3d at 950; *Reed*, 399 F.3d at 920. The Court should reverse the Commissioner's decision only where it falls outside "the available zone of choice," meaning that the Commissioner's findings is not among the possible positions that can be drawn from the evidence in the record. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008).

## III.  Discussion

Mr. Schake raises two main challenges to the Commissioner's decision that he is not disabled. First, he contends that ALJ Kimball erred when he found that Mr. Schake does not meet or medically equal any of the identified Listings. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 2, 8–12, ECF No. 14.) Second, he argues that the ALJ's RFC finding was not supported by substantial evidence. (Pl.'s Mem. at 12–17.) For the reasons that follow, the Court finds the ALJ's decision concerning the Listings and his RFC analysis to be properly supported.

### A. The Listings Issues

Mr. Schake challenges ALJ Kimball's determination that he does not meet or medically equal any of the Listings in two broad arguments. First, he argues that the ALJ committed several errors in finding that he neither meets nor medically equals Listing 11.02 for convulsive epilepsy. Second, he claims that ALJ Kimball erred in analyzing the evidence relevant to the "paragraph B" criteria contained in Listings 12.02, 12.04, and 12.06 applicable to his mental impairments, suggesting that the evidence supports more profound restrictions in his ability to function socially and to maintain concentration, persistence, and pace. The Court finds that the ALJ's Listings-related findings are adequately supported.

#### 1.  *Listing 11.02 – Convulsive Epilepsy*

Listing 11.02 contains the following criteria:

11.02 Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.

> A.  Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B.  Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 11.02[4]; *see Bellew v. Acting Comm'r of Soc. Sec.*, 605 Fed. App'x 917, 920–21 (11th Cir. 2015) (describing requirements of Listing 11.02).

The record contains evidence indicating that Mr. Schake suffered from a seizure disorder and that he sought treatment for seizure-related symptoms on several occasions after his May 2012 motorcycle accident. Between May 2013, and October 2015 the medical records reflect reports of seizures on the following dates: (1) May 29, 2013; (2) July 7, 2013; (3) September 18, 2013 (two); (4) two possible seizures in October 2013; (5) December 5, 2013; (6) January 31, 2014; (7) February 3, 2014; (8) April 10, 2014; (9) April 12, 2014; (10) June 13, 2014; (11) August 4, 2014; and (12) a possible seizure in October 2015. (AR 775–85, 810–15, 939–70, 995, 1004, 1100–02, 1097–99, 1169–75.) However, the record supports the ALJ's conclusion that there was insufficient evidence that Mr. Schake's seizures met all the criteria of Listing 11.02.

### a. Indeterminate Evidence and Significant Gaps

First, the record does not clearly establish that Mr. Schake experienced all of the seizures identified above. Several of the treatment records documenting reported seizures are either equivocal about the existence of a seizure or lack a detailed description regarding its pattern. Though Mr. Schake reported two possible seizures in October of 2013, the relevant treatment note recording his report states only that "he has had a few spells which *may or may not* be seizures." (AR 973–74 (emphasis added).) Similarly, a treatment note from February 3, 2014 indicates that Mr. Schake had a seizure two months earlier on December 5, 2013 (AR 1004), but there is no medical record that actually documents that event with a detailed description of a typical seizure pattern as required by Listing 11.02. Likewise, the treatment record

---

[4] The Listing for epilepsy was amended and the current version was made effective March 14, 2018. Because Mr. Schake's case was decided well before that date, the Court applies the version of Listing 11.02 that was in effect at the time of the Commissioner's decision in this case.

referencing a seizure in October 2015 notes that "[i]t is unclear if this was a seizure or that he tripped." (AR 1169.) These records fall short of Listing 11.02's requirement that convulsive seizures be "documented by detailed description of a typical seizure pattern, including all associated phenomena . . . ."

Second, even if Mr. Schake experienced every seizure listed, they fall well short of the "at least monthly" pace required the Listing. Indeed, from the time the seizures began through the last one documented in October of 2015, well over half of the months had no seizure at all. And it appears that Mr. Schake passed more than a year, from mid-2014 to October 2015 without a documented seizure.

Finally, Mr. Schake asserts that in applying Listing 11.02, the ALJ erroneously found that "the administrative record is not significant for convulsive epilepsy." (Pl.'s Mem. at 8.) This argument is without merit. Mr. Schake excerpts only a portion of a sentence from the ALJ's opinion that, when read in full, explains that the evidence is insufficient to establish all the criteria of Listing 11.02, but which acknowledges Mr. Schake suffers from seizures. Indeed, ALJ Kimball found that one of Mr. Schake's severe impairments was a seizure disorder (AR 31), and the written decision extensively discusses medical records reflecting that Mr. Schake sought treatment related to that disorder (AR 41–46).

### b. Medication Compliance

Mr. Schake argues at length that the ALJ erred in his consideration of his alleged failures to take his medication as prescribed. The Court disagrees for several reasons. First, substantial evidence supports the ALJ's observation that "when [Mr. Schake] is compliant with prescribed treatment, he does not experience seizures at this listings level of severity." (AR 32.) Several of the treatment records document that Mr. Schake's most frequent seizures occurred at times when his prescribed medications were at subtherapeutic levels. For example, Mr. Schake stated that he decreased his dosage of Dilantin at the time of his July 7, 2013 seizure. (AR 856–58.) His Dilantin levels returned "very low" after his January 31, 2014 seizure. (AR 995–

97, 1104.) His Dilantin was again found to be subtherapeutic on February 21, 2014. (AR 1081.) He was not taking his prescribed Depakote at the time of his June 13, 2014 and August 4, 2014 seizures. (AR 1100–02, 1097–99.)

Second, the Court is not persuaded by Mr. Schake's argument that the ALJ ignored the role his poverty played in his medication regime. Mr. Schake specifically argues that he had a good reason for failing to follow a prescribed course of medical treatment because his noncompliance was due to financial problems. (*See* Pl.'s Mem. at 8–9.) Conditions that can be controlled by treatment or medication are not disabling. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). "'Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.'" *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Roth*, 45 F.3d at 282). "'[A] lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be . . . an independent basis for finding justifiable cause for noncompliance [with prescribed treatment].'" *Brown*, 390 F.3d at 540 (quoting *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984)). But if the record contains evidence that is inconsistent with a claim that a lack of financial resources prevented compliance with prescribed treatment, it is not error for an ALJ to rely on noncompliance as one of the reasons for rejecting a finding of disability. *See id.* (finding evidence that the claimant had access to free samples of medication, regularly sought medical treatment, and had medical insurance coverage inconsistent with her "claim that a lack of financial resources kept her from acquiring the treatment prescribed for her [impairment]"). Here, multiple factors undermine Mr. Schake's claim that the only reason he was not fully compliant was his lack of insurance and money.

Certainly, several treatment notes reflect Mr. Schake's statements to physicians about his difficulty affording his anticonvulsant medications, and he testified about his financial struggles with insurance as well. (*See, e.g.*, AR 80, 1047–51, 1058–64, 1098, 1105.) However, ALJ Kimball found that the record was inconsistent with Mr. Schake's claim that a lack of financial resources kept him from acquiring his

prescribed medication for his seizure disorder. The ALJ reasonably found that although Mr. Schake told providers he could not afford his medication without insurance, "he simultaneously reported using cannabis instead . . . which he presumably and inexplicably was able to afford."[5] (AR 48.) And although Mr. Schake was twice referred to a social worker at the Minnesota Epilepsy Group for help with prescription drug costs, the record supports the ALJ's observations that he failed to take advantage of this option. (AR 48, 1129, 1158.)

ALJ Kimball's rationale for rejecting the reason Mr. Schake gave for noncompliance was not erroneous. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) ("The ALJ also considered Riggins's admission that he had not taken prescription pain medication for years. Although Riggins claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication."); *Murphy v. Sullivan*, 953 F.2d 383, 386–87 (8th Cir. 1992) (rejecting claim that lack of financial resources prevented compliance where the evidence did not show that the claimant tried to obtain low cost medical treatment or was denied care based on inability to pay).

In addition to raising his poverty as an explanation for his inconsistent taking of medication, Mr. Schake argues that "[t]he record shows that Mr. Schake continued to have seizures while compliant with medication." (Pl.'s Mem. at 9.) In support of this argument, Mr. Schake points to treatment records from April 16, 2014, and June 25, 2014, suggesting that his seizures occur despite efforts at treatment with

---

[5]    At times when he had seizures and was noncompliant with his anticonvulsant medication prescriptions, Mr. Schake reported smoking marijuana because he felt it helped address his seizures. (AR 1105 (January 2014 treatment note reporting inability to afford medication but indicating that he "[s]mokes marijuana daily"); AR 1100 (June 2014 treatment note indicating inability to afford medication but "endors[ing] frequent drug use"); *see also* AR 1169 (February 2016 note indicating that "[h]e has been smoking marijuana daily for the past year, which he feels has been beneficial in terms of seizure control").)

medication. (*Id.* (citing AR 1083, 1129).) However, the fact that Mr. Schake can point to some evidence that weighs against the ALJ's findings does not mean that the decision is not supported by substantial evidence. *See Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (providing that a reviewing court does not reverse the Commissioner's decision "'merely because substantial evidence would have supported an opposite decision'") (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995)). And regardless of medication compliance, Mr. Schake's seizures never achieved the frequency mandated by Listing 11.02. The record as a whole supports the ALJ's determination that Mr. Schake failed to establish all the criteria for Listing 11.02.

### 2. The Paragraph B Criteria

Mr. Schake argues that in evaluating whether he meets or medically equals any of the Listings for mental disorders, ALJ Kimball erred in finding that he has only moderate, as opposed to marked, difficulties in social functioning and in maintaining concentration, persistence, and pace. (*See* Pl.'s Mem. at 10–12.)

The applicable Social Security regulations provide the following guidance concerning the assessment of the severity of limitations created by a claimant's mental disorders:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts

Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

….

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) & (3) (Mental Disorders, Assessment of Severity).

A "marked" limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitations is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App.

1, § 12.00(C). "Where [the SSA] use[s] 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme." *Id.*

### a. Social Functioning

Concerning social functioning, the ALJ noted that Mr. Schake: (1) consistently went outside and remained in public by himself on a daily basis; (2) walked his dog daily and went with his dog to a park near his house; (3) shopped in stores regularly; (4) spent time with others daily, including talking on the phone and texting with family and friends; (5) regularly visited his mother; (6) regularly attended medical appointments; and (7) attended family get-togethers, friends' birthdays, and went to the Mall of America for walks. (AR 33.) The ALJ also noted that Mr. Schake reported doing well with authority figures, but had trouble getting along with his brothers and developed a shorter temper after his motorcycle accident. (AR 33–34.) These findings are supported by substantial evidence.

Mr. Schake asserts that the ALJ erred in relying on evidence that he attends doctor appointments as a social activity, that he has contact with family members who must check up on him to see if he has been injured from a seizure, and that he attends family get-togethers and can shop because he does not take part in family gatherings and does not shop alone. (Pl.'s Mem. at 11.) The Court finds no error. Mr. Schake's regular attendance at doctor appointments indicates that he has some ability to function appropriately in a setting requiring interaction with others, and his treatment records do not document highly antagonistic, uncooperative, or hostile behaviors during any of those appointments. Though Mr. Schake correctly points out that he indicated he gets help shopping and may be withdrawn at family gatherings, the evidence in the record still does not demonstrate a history of altercations, avoidance of interpersonal relationships, or social isolation. The record overall supports the ALJ's determination that Mr. Schake's restrictions in social functioning were not "marked."

Mr. Schake further argues that the ALJ erred by failing to discuss Dr. Dorothy Edelson's findings in a Personality Assessment in connection with his social-functioning findings. (Pl.'s Mem. at 11.) As noted above, Dr. Edelson examined Mr. Schake on April 21, 2014 as a consultant for the Social Security Administration. (AR 1026–35.) Though ALJ Kimball did not specifically address Dr. Edelson's assessment in his analysis of the paragraph B criteria, he discussed the assessment at some length in his RFC analysis. (AR 51–52.) Dr. Edelson diagnosed Mr. Schake with a mood disorder, PTSD, and an anxiety disorder. (AR 1033.) Dr. Edelson noted the following in the "summary and recommendations" portion of the assessment:

> Although he has gotten along with coworkers in the past, his current hypervigilance is likely to interfere with working in close proximity to others. Increased irritability and crying since his head injury may annoy coworkers or be disruptive. He likely can accept constructive criticism and directions from supervisors. Employers may hesitate to hire him due to fears of increased liability because of his poorly controlled seizures. . . . Under conditions of increased stress and pressure he is likely to experience increased depression, irritability, insomnia, anxiety and suspiciousness. . . .

(AR 1034.) Dr. Edelson noted that he reported increased anger and hypervigilance since his motorcycle accident and that he cried when discussing diminished abilities. (AR 1028.) Dr. Edelson also noted that Mr. Schake "answers questions directly" and "has good social skills." (AR 1028.)

Overall, Dr. Edelson's assessment supports a finding that Mr. Schake's social functioning is more than mildly limited and indeed suggests that his difficulties would create certain issues within an employment setting. But this assessment does not place the ALJ's finding of "moderate" limitations in the social-functioning domain beyond the acceptable zone of choice, especially given the substantial evidence in the record showing that Mr. Schake engages in social activities on a regular basis without exhibiting highly antagonistic, uncooperative, or hostile behaviors. *See Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2016) (providing that a reviewing court should "disturb the ALJ's decision only if it falls outside the available zone of choice").

## b. *Maintaining Concentration, Persistence, and Pace*

Concerning restrictions in maintaining concentration, persistence, and pace, the ALJ found that Mr. Schake had moderate difficulties. (AR 34.) In support of this finding, ALJ Kimball noted that Mr. Schake reported having trouble with his memory, completing tasks, concentrating, understanding, following instructions, and handling stress and changes in his routine. (AR 34.) The ALJ also noted Mr. Schake's low-average cognitive performance, full-scale IQ score of 87, and weaker verbal skills, all of which were documented in neuropsychological evaluations. (AR 34.) However, the ALJ explained that Mr. Schake "consistently reported being able to count change, pay bills, and handle household and banking accounts . . . . He reported no longer forgetting to take Dilantin, after he started using a seven day pill box." (AR 34.) The ALJ also indicated that Mr. Schake said he was able to follow television programming and playing guitar, "albeit with some left-handed weakness." (AR 34.)

The ALJ's finding that Mr. Schake has moderate limitations in maintaining concentration, persistence, and pace is supported by substantial evidence. Mr. Schake's function reports, on which ALJ Kimball specifically relied, generally support the finding of moderate difficulties in this domain. (AR 256–71, 292–99.) Mr. Schake also testified that he can do the dishes and his laundry, and he can keep up with his household chores. (AR 89–90.) He testified that if he is interested in what is on the television, like a football game, he can follow what he is watching. (AR 92.) And Mr. Schake testified that he has built birdhouses, painted walls in his house, and built lawn furniture (albeit at a slower than production pace). (AR 93–95.) The ALJ's decision is also supported by the opinion of the non-examining consultants who reviewed Mr. Schake's records at the initial and reconsideration stages.[6] (AR 121, 137–38.) A finding of moderate limitations in maintaining concentration, persistence, and

---

[6]    Mr. Schake does not argue that it was error for the ALJ to give significant weight to these opinions.

pace adequately accounts for the evidence that Mr. Schake is able to complete certain simple tasks, but takes longer or needs assistance with more complex activities.

Mr. Schake contends that the ALJ ignored evidence concerning his inability to sit through a movie, difficulties remembering instructions, trouble listening to others, and lack of interest in playing the guitar for a significant period. (Pl.'s Mem. at 12.) The Court concludes that Mr. Schake's statements about the assistance he requires in some activities does not undermine the determination that he has moderate limitations in maintaining concentration, persistence, and pace. Mr. Schake's ability to point to evidence that detracts from the ALJ's finding does not mean that the ALJ erred. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995) ("Evidence that detracts from the Secretary's decision is considered, but even if inconsistent conclusions may be drawn from the evidence, the decision will be affirmed where the evidence as a whole supports either outcome.").

Mr. Schake also argues that the ALJ erred by failing to "mention Mr. Schake's impaired score in sustained attention on the neuropsychological exam and that the examiner, Dr. Doss concluded that Mr. Schake would have problems with focus, concentrating and remembering new information." (Pl.'s Mem. at 12 (citing AR 1054, where Dr. Doss noted particular issues with "novel problem solving, focus, concentration, and remembering new information").) The ALJ explicitly discussed Dr. Doss's evaluation in his evaluation of the paragraph B criteria and noted the opinion about particular difficulties Mr. Schake would have remembering new information. (AR 34–35.) The ALJ correctly observed that Dr. Doss "opined that he saw no contraindication to the claimant working in familiar vocations." (AR 35, 1054.) The Court finds no error in the ALJ's treatment of Dr. Doss's opinion.

## B. The RFC Issue

As noted above, the second issue raised by Mr. Schake concerns ALJ Kimball's RFC finding. (Pl.'s Mem. at 12–17.) The RFC should reflect what a claimant can do despite his or her limitations, 20 C.F.R. § 404.1545, and it is the claimant's burden to

prove the RFC, *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "Some medical evidence must support the determination of a claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

The Court finds that the RFC determined by the ALJ is supported by substantial evidence on the record as a whole. Generally, the exertional limitations reflected in the RFC, which Mr. Schake does not contest, account for his physical impairments and their combined effects on his ability to function. The non-exertional limitations (regarding simple, routine and repetitive tasks, but not at a production rate pace, and providing for only occasional interactions with supervisors, coworkers, and members of the public) also adequately account for and reflect substantial evidence from throughout the administrative record. In addition, the ALJ included specific restrictions related to Mr. Schake's seizure disorder, as explained in more detail below.

### 1. Seizure Disorder

Mr. Schake first argues that the ALJ failed to account for his seizure disorder when formulating the RFC, erred in concluding that his seizures are controlled while compliant with medication, and failed to include relevant limitations related to that disorder in the hypothetical questions to the vocational expert. (Pl.'s Mem. at 13.) The Court disagrees for several reasons. First, it is inaccurate to assert that the ALJ did not account for Mr. Schake's seizure disorder when formulating the RFC in this case. In fact, ALJ Kimball extensively discussed Mr. Schake's seizure disorder and the medical records documenting it. (AR 37, 41–45, 48.) Second, as explored above, there is evidentiary support for the ALJ's determination that while compliant with his medication, his seizure disorder is largely well controlled and that many of his seizures have occurred during periods of medication noncompliance. (*See, e.g.*, AR 48 (ALJ opinion regarding control of disorder while medication compliant); AR 775–76 (May 29, 2013 seizure treatment note indicating that Mr. Schake was on Dilantin for seizure prophylaxis following his May 2012 accident, but did not have seizures at that time; he was taken off Dilantin in January 2013); AR 980 (noting that after Mr. Schake's July 7,

2013 seizure he was restarted on phenytoin and "has not had any further seizures"); AR 1177 ("He has been able to afford his medication and his seizures have improved."); *see also* discussion, *supra*, at p. 11–12.) And third, the ALJ specifically indicated that Mr. Schake's seizure disorder would prevent him from engaging in work that would expose him to hazards, machinery, and heights, thereby incorporating specific limitations into the RFC that relate to that disorder.[7] (AR 37.) There is no support for an assertion that the RFC did not reflect Mr. Schake's seizure disorders.

### 2. Dr. Doss's Neuropsychological Opinion

Pointing to Dr. Doss's March 25, 2014 opinion, Mr. Schake next argues that "[t]he ALJ does not include any limitation for Claimant's impaired ability to sustain attention and memory problems as established by the neuropsychological exam." (Pl.'s Mem. at 14.) In fact, the ALJ specifically found that Mr. Schake is "limited to performing simple, routine and repetitive tasks, but not at a production rate pace (for example, assembly line work)[.]" (AR 35–36.) Moreover, as noted above, in his report following the March 25, 2014 neuropsychological exam Dr. Doss opined that "[i]n particular, novel problem solving, focus, concentration, and remembering new information will be most problematic" and stated that he "sees no contraindication to [Mr. Schake] working in familiar vocations." (AR 1054.) The above non-exertional limitations in the RFC finding directly account for Dr. Doss's opinion.

---

[7] Mr. Schake asserts that "[t]he VE testified that work would be precluded with this RFC if the Claimant had the inability to work in close proximity to others." (Pl.'s Mem. at 13.) Though not stated explicitly, Mr. Schake implies that the ALJ should have included such a limitation in the RFC finding. However, the Court cannot find evidence in the record showing that the ALJ erred in failing to find that Mr. Schake could not work near other people. The closest any evidence comes is Dr. Edelson's assessment (*see* AR 1034), but even that opinion does not suggest that Mr. Schake is completely unable to work around others.

### 3. Dr. Edelson and Dr. Atkinson

Mr. Schake contends that the ALJ erred in assigning weight to the opinions of Dr. Edelson and Dr. Atkinson. (Pl.'s Mem. at 14.) He asserts that the ALJ should have given more weight to Dr. Edelson's opinion "that Mr. Schake would have difficulty remembering instructions and keeping track of what he was doing." (*Id.* (citing AR 1033, 1034).) And he contends that the ALJ should have given more weight to Dr. Atkinson's opinion "that Mr. Schake suffers from short-term memory, attention and executive deficits." (*Id.* (citing AR 1092).) The Court finds no error in the ALJ's treatment of these opinions.

The ALJ assigned "little evidentiary weight" to Dr. Edelson's opinions that Mr. Schake's hypervigilance would likely interfere with working in close proximity to others, that his increased irritability and crying would annoy coworkers or be disruptive, that employers might be hesitant to hire him due to fears of increased liability based on reportedly poorly controlled seizures, and that he could not manage benefits in his own interest. (AR 53.) ALJ Kimball determined that he was unable to assign more weight to those opinions

> because they are not generally consistent with the evidence overall, including largely unremarkable findings across multiple mental status examinations, the paucity of even conservative outpatient treatment, the claimant's noncompliance with recommendation to attend the Courage Kenny program, and the claimant's reports and testimony concerning his independence in daily functioning.

(AR 53.) Mr. Schake asserts that this is an insufficient articulation of the reasoning for rejecting these opinions. (Pl.'s Mem. at 14.) But, in fact, the ALJ adequately explained the reasons for assigning little weight to Dr. Edelson's opinions and exhaustively discussed the medical records throughout the section of his opinion devoted to the RFC finding. Failing to repeat the numerous citations to the record in the context of discussing the weight attributed to Dr. Edelson's opinion is, at most, an arguable deficiency in opinion-writing and is not a basis for remand. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (providing that deficient opinion-writing is not a

reason to reverse an ALJ's finding where the deficiency would not affect the outcome of the case).[8]

The ALJ's handling of Dr. Atkinson's July 9, 2014 opinion was also well supported. Dr. Atkinson indeed noted that Mr. Schake has difficulties with short-term memory, attention, and executive functioning. (AR 1092.) Because of those issues, Dr. Atkinson opined that Mr. Schake "should be restricted from jobs that require substantial new learning of tasks/procedures." (AR 1092.) The ALJ gave Dr. Atkinson's opinion significant evidentiary weight because it was "generally consistent with the evidence overall" and was "not categorically inconsistent" with the mental RFC. (AR 54.) Mr. Schake fails to explain why the RFC was required to contain any limitation based on Dr. Atkinson's opinion beyond those already included.

### 4. Lack of Medical Opinion Supporting Mental RFC

Finally, Mr. Schake contends that "[t]he ALJ did not have a medical opinion in the record supporting the mental limitations in the RFC." (Pl.'s Mem. at 16.) "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Having reviewed the entire record, the Court is satisfied that the ALJ's RFC finding is supported by medical evidence of Mr. Schake's ability to function in the workplace. *See id.*

---

[8] Though not stated directly, Mr. Schake suggests that Dr. Edelson's opinion is consistent with other evidence in the record because a September 4, 2013 treatment note from Dr. Boardman noted that Mr. Schake complained of increasing memory problems, exhibited by locking himself out of his house several times and forgetting why he stood up from a chair. (Pl.'s Mem. at 15 (citing AR 979).) Dr. Boardman's note does not undermine the substantial evidence that supports the ALJ's RFC finding or the decision that Dr. Edelson's opinion was entitled to little weight, which the ALJ was required to evaluate based on the record as a whole. *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995) ("The ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole.").

("'Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.'") (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2017)).

## IV.    Order

For all the foregoing reasons, **IT IS HEREBY ORDERED THAT**:

1.  Mr. Schake's Motion for Summary Judgment **[ECF No. 13]** is **DENIED**.

2.  The Commissioner's Motion for Summary Judgment **[ECF No. 15]** is **GRANTED**.

3.  This matter is dismissed with prejudice.

**Let Judgment be entered accordingly**.

Date: September 18, 2018                    *s/Katherine Menendez*
                                            Katherine Menendez
                                            United States Magistrate Judge